Good morning. Margaret Schmucker on behalf of the co-defendant Starisha Chantel Moore. Lewis has, his counsel has waived oral argument and so I won't be arguing anything in relation to Mr. Lewis as part of the case. Okay. I want to start by talking about the standard of review on the first issue, which is whether the evidence was sufficient to prove that Moore was a criminal rather than a victim of Lewis's sex trafficking organization. The government has argued that this doesn't get de novo review because it wasn't preserved by proper Rule 29 motions at the end of the trial, at the end of the close of evidence and at the end of the trial. That was raised. I mean, if you look at the record, it's at 431 and 497. And I think it's pretty clear from what you read there that the argument was that they had failed to prove that Moore caused transportation, harboring, prostitution, any of the acts that followed, or that there was any causation involved in any of this. And I think if you look at that and look at what comes before and after that, I think it's pretty clear that everyone understood she was challenging all three counts, they were challenging all three counts of the indictment. Beyond that, the government seems to argue that this court only has to judge the sufficiency of the evidence causation standard as knowledge that the two minor victims, CM and KM, will be caused to engage in sex trafficking. Instead of that, Moore did cause them to be engaged in sex trafficking, which was alleged in the indictment. So if you look at the actual language of the indictment, it does say, did cause, and that's at 17 and 18 of the record. For the sake of argument, if she hadn't set up the motel rooms and set up the website and communicated with the Johns, they wouldn't have been caused to participate in underage prostitution, would they? Well, I think the problem there is that Lewis was directing what Moore did. He was in control of her. He was telling her to make the reservations. He was telling her to go online and do that. And there was evidence that he was violent towards the girls, that he hit KM, that he had slapped them, that he was in control of the money, where they went, what they wore, and how they managed the business. But didn't she deposit the money in her own account? She did, but she only used it in his direction and in the way that he said. She had to ask permission to get money for food for the girls. She drove the victims to their dates? Again, either at his direction or at their request. So, you know, she's doing it, but she's being, you know, essentially directed and told to do it under threat of, you know, threat of violence. I mean, he's hit the other girls and there was testimony that he had been violent towards them. So, you know, I guess you have to wonder whether, you know, can someone who is themselves that much of a victim really have the mens rea, the scienter necessary to satisfy the criminal conviction? Is there evidence of violence perpetrated against her or just the threats of the violence? My recollection is that there was violence against the two, for sure against CM and KM, and that, and that I believe he threatened all of the girls if they didn't. About Ms. Moore, my question is, was there evidence of violence by him against Ms. Moore or are you just arguing, not just arguing, but are you arguing the threats of violence? I'm just trying to work, did he actually strike her? Is there any evidence of that in the record? Is there any, is it, well, I think there was just general threats of violence. I know there was actual violence against CM and KM. I don't recall specifically the page number where I can tell you to find testimony of actual violence against Moore, if that's what you're asking. To get back to the point I was trying to make is that they're trying to change the standard that you have to review this by from that she did cause the sex trafficking to that she had knowledge that it will be caused to engage in sex trafficking. Those are two different standards, and this whole issue came up during the jury instruction conference, and that was discussed, and the government ultimately accepted the instruction that was given, which said they have to prove that she did cause it, and they literally said we're going to stick with what has been charged in the indictment. The government has not cross-appealed that It would, a jury instruction error that goes to the statutory construction is reviewed de novo, so we still get de novo review either way you look at it. The government also argues that the evidence is sufficient to prove Moore under this sort of more relaxed standard. That's sort of the bulk of their argument. Again, they really have to prove what they've alleged, and that's very clear out of the United States v. Lockhart case, which was just December of last year, that even if it's possible under the statute to convict someone based upon less culpability, if it's not alleged that way, you can't uphold the conviction based upon that. In this case, let me go back to Garcia-Gonzalez case, which was that the defendant knowingly recruited, enticed, harbored, transported, obtained, or maintained the victims. And then the other element was that the defendant committed such act knowing or in reckless disregard of the fact that the victim would be caused to engage in the commercial act. That was the language in the indictment. And then the jury was instructed accordingly. They sent out a jury note that said, does the Sex Act have to occur to find the defendant guilty of sex trafficking under Section 1591? And the government came — the court came back and said, no, you don't. And this went up on appeal. And in the appeal in this court, the court said, the future verb tense of will be caused indicates that the Sex Act does not have to occur to satisfy the elements of 1591. So that was in that case. They're defining what the phrase will be caused means for the purposes of Section 1591. So the problem is, is that the knowledge that something will be caused is different in a lesser standard than that she actually did cause it, and it varies the indictment. Wasn't she also charged with aiding and abetting? Yes, she was. And I'm sure the next question is, how does this differ from aiding and abetting? Well, if you do the aiding and abetting instruction, that allows the jury to convict on a foreseeable conduct of a co-conspirator which has actually occurred. If you allow the government to have its way on this, then it will also be allowed to convict. Their construction is that you can convict a defendant based on a sex act which was intended by another person, which has not occurred, even though that theory of liability was not pled in the indictment. But that's not the fact here. I don't understand. Your hypothetical is one thing, but the facts here are that the harm did occur, so you certainly aided and abetted. Well, exactly my point. Well, they're alleging in the indictment and they're saying that they're saying that, alleging in the indictment that she caused it. But then in their brief, they're arguing that it's enough that she had knowledge that it would be caused, and then their argument is that evidence is enough that there was knowledge that it will be caused. They don't get an affirmance on that. They have to prove what they allege in the indictment. They have to prove that she caused it. And if you allow the government to interpret the knowledge will be caused instruction as the way they're trying to do it here, then it goes beyond even the aiding and abetting instruction. Because at least in the aiding and abetting instruction, they have to do foreseeable conduct of a co-conspirator, which is actually incurred. And this is — What's the best case you have for the argument that you're making based on the evidence in this case? Well, there's no case that exactly matches this that I was able to find. There's two cases that were talked about in both of the — in the briefs. The Garcia-Gonzalez case obviously does the — defines for us what the meaning of knowledge that something will be caused is within the purpose of 1591. And that sort of sets up the argument that you can't — you can't do that unless it's alleged. And then if you look at United States v. Lockhart, which, Your Honor, you wrote in December, it says when the indictment alleges a particular set of facts as forming the basis for a defendant's violation of the statute, and the court allows evidence of other facts not alleged in the indictment to form the basis of the jury's verdict, there's a constructive amendment to the indictment. And so they're arguing it's enough here that she had knowledge that it was going to happen, even — I mean, yeah, they said it did happen. But the point is here is that they have to prove she caused it, not just that she knew that it was going to happen. And haven't you ever heard of the doctrine of concurrent cause? I don't — I don't think necessarily this falls under the doctrine of concurrent cause. I mean, did the government have to prove beyond a reasonable doubt that Lewis himself would have been unable to dress the girls, rent the rooms, handle the — you know, deposit the money, work on the Internet, et cetera? Well, I mean, I don't — I just don't understand your argument. Well, I — you know, again, I think you're going back to, you know, sort of the someone who is so under somebody else's control. Certainly, you weren't the trial counsel, were you? No, I was not. Well, whoever the trial counsel was certainly had the opportunity to put that to the jury, and the jury were not persuaded. Well, I don't — I mean, that's why we're here, right? Because we want to look at what the — whether what is in the evidence supports the jury's verdict the way it was alleged. Well, I mean, you are arguing the evidence, but you're arguing that the evidence doesn't prove that the defendant caused the minor to engage in a commercial sex act. And part of that is that the — the Stockholm Syndrome is like Patty Hearst. Right. You're old enough to remember that. Yes, I am. She took part in the bank robberies, but it was like confession and avoidance. She didn't say that she didn't take part in the bank robberies. She said she wasn't — didn't have the mens rea and wasn't responsible. But all this is, this is the first part, did the defendant cause. The Stockholm Syndrome essentially admits that the defendant did what she did. Well, I think the difference here is sort of what initiated the whole process, because in this case, it was Selena who recruited CM, the first of the two minor girls. And then it was CM who recruited KM. There's no evidence that Moore was the recruiter that brought the girls into the situation in the first place. And once they're in the situation and they're being instructed by Selena, they're being instructed by Mr. Lewis about what they're supposed to do and how they're supposed to do it, and Mr. Lewis is in control of the money and telling everybody what to do, I think that's a little different than the situation in the Patty Hearst. Because those people were all involved ahead of her instead of coming in after her. So, in any event, I think you have to be cautious, very cautious here about allowing this sort of will — knowledge that something will be cause proof to be enough when it's not alleged, because then you really are expanding the aiding and abetting beyond something that actually occurred, but also potentially to a sex act which was attended, which has not actually occurred, even though we know in this case that the girls did engage in sex acts. That can't really be disputed, but you run the risk of adopting their point of view, and then in the next case that comes up, then that's what happens. And I think that's a bad idea. So you have sentencing issues, do you? Well, there were sentencing issues. I don't think it was about whether the sentence was unreasonable, given the disparity of her involvement from Lewis's, and whether or not her arguments for downward variance were adequately dealt with by the courts. The Fourth Circuit at least has said that if a motion for downward variance is made, it's not enough to sort of do just generalities. I think 3553 is fine. You really have to address each specific one of those points that is raised in support of the downward variance and explain why you're saying no. The record is — to me it doesn't read like it necessarily addresses all of those. I think it's pretty weak. And, of course, you can go through and review, but I just don't think it necessarily does. The issues that were brought were the characteristics of the defendant, the acceptance of responsibility. The Stockholm Syndrome was, in fact, discussed in that context. Isn't this a plain error review? On this, no, there was a motion for downward variance made. So it is preserved. And the motion for downward variance, if you want to look at it, it's at 2295 through 2299, basically. But they talk about relevant conduct and the specifics of the relevant conduct and the specifics of the characteristics of the defendants and that sort of thing. And I don't think really the court went through those with sort of the fine-toothed comb that the Fourth Circuit would suggest at least is necessary in those circumstances. Anyways, let me just conclude by saying that I think to the extent that it can argue that Moore's role was sort of integral to the criminal venture, I really don't think that you can say that her purpose was to make the venture successful, which is necessary for the aiding and abetting. I mean, I think she was doing it because she was being told to do it by Lewis and she was being controlled by him. I think the evidence really well supports that. Over and over again, the evidence says, you know, he was the one giving all the instructions. I also want to point out that the government's statement of facts, I think, is somewhat argumentative, and it's not a completely accurate reflection of the record. I only have a few couple seconds left. But, for example, on page 4, they said that, you know, she withheld sleep and food from them, and CM specifically testified that Moore never withheld sleep or food from them. So that's just one point. There are a number of them in that statement of facts that are argumentative or that are inaccurate. Thank you. All right. Thank you. You've reserved four minutes for rebuttal. We'll hear you back up. All right. Let's hear from the government. Ms. Berenguer, are you trial counsel or are you here on appeal? Your Honor, I'm appeal. May it please the Court, Elizabeth Berenguer from the Western District of Texas on behalf of the United States. The Court doesn't need to reach the issue here of whether the indictment charged elements that were not required by the statute because there was overwhelming evidence that the defendant under an aiding and abetting theory of liability committed sex trafficking even under a heightened standard that a principal knowingly caused the minors to engage in sex. The evidence in this case clearly reflects, and most of these elements were admitted by the defendant at trial, that she created and paid for online ads on Backpage.com for both of the minors to commit sex acts with men. She personally answered the phone calls and internet inquiries from these men. She made the logistical arrangements for the dates. She set the prices for the dates depending on how the men who called her talked on the phone. She drove the girls to outcalls and a Dodge Charger that was paid for with money that was paid for the minors to engage in sex. She deposited the money in her own bank account. She instructed one of the girls on code words to send her as soon as the men showed up. She provided KM with detailed rules that they would have to follow during these sex acts. She dyed CM's brown hair blonde so she would make additional money because blondes make more money. She reserved and paid for motel rooms that the girls lived in and used for their in-calls. She purchased provocative clothing for the girls to wear on their dates. She had been a prostitute herself before this took place, right? Yes, Your Honor. Okay. That is what the evidence reflects. So that's where she gained her expertise. Yes, Your Honor. And it also would show how she knew her actions would cause the girls to engage in sex acts. That is one of the pieces of evidence in support of that. So even under a heightened standard that was charged in the indictment that she caused the girls to engage in sex acts, that was met here. And I agree with defense counsel that Garcia-Gonzalez clearly sets forth the difference between what it means to knowingly cause a minor to engage in a sex act versus knowing the minor would be caused. And that is whether the sex acts occurred. And that's absolutely undisputed in this case that the sex acts occurred over the course of the three months. And this is consistent with the prosecutor's argument at trial during closing argument on pages 530 and 531 of the record when they were discussing what this element means. And the prosecutor said it means that these sex acts occurred. It caused the sex acts occurred over and over and over. So merely because the indictment charged this language of causing versus would be caused, that doesn't affect the sufficiency determination on these facts. I would like to distinguish briefly this case from Lockhart. This is not a Lockhart situation. This is not a constructive amendment situation. In fact, Masaccio in footnote 2, that's the Supreme Court case that recently came out in 2016, left open the question of whether the government would be held to a standard when they charged an element in the indictment that may have not been included in the statute. This isn't a situation that it's an alternative element of the statute like it was in Lockhart. They used the wrong tense. The indictment used the wrong tense. It's an awkwardly phrased statute, as the Ninth Circuit has recognized in Todd, that the language of the statute is awkward to put in sentence form. And the prosecutor in this case used an artful phrasing that didn't track the language of the statute in this exact situation. So just that's not Lockhart. This is sufficiency. It's not a constructive amendment. I think the court is well aware of the government's position on the standard of review. When looking at the record, maybe perhaps defense counsel intended to challenge different elements of the statute, but in their Rule 29 motion, they only referred to that causation element, which is, of course, element 3 of counts 1 and 2. It's not an element of the transport, which, of course, there were concurrent sentences in this count. So it's not an element of count 3, and it's only in reference to element 3 of counts 1 and 2. If I would have one moment. I absolutely agree with the comment that Judge Jones made as far as the arguments that the defendant here was a victim and that she was under the coercion of the defendant was clearly put forth at trial. That was something that was relayed to the jury over and over again and in closing argument. I would just remind the court that the defendant testified in this case, and she did not claim that the defendant made any sort of violent actions toward her. And even in the sentencing transcript, the judge had an opportunity to evaluate this in light of the motion for downward variance, and he disagreed with this assessment of the testimony. In a nutshell, if she didn't testify that she was doing it at coercion, what was her defense? Her defense was that she claimed she didn't really know their ages, which was, of course, contrary to the statement she made to the police after her arrest. She claimed that they sort of were voluntary, and she was just sort of assisting them getting going, which, of course, coercion is not a defense to this statute, as we've seen in Garcia-Gonzalez's statutory text. She just said she basically had a limited involvement, that she was— She never said what counts as argument. I did it, but it's because he was going to beat me, et cetera, et cetera, et cetera. So in other words, we read her full testimony. We will not see her words evincing the argument made about Donna under coercion. I have read it, and from what I have read, I did not see any sort of her saying there were threats of violence against her at all. And also, there was contrary evidence in the record. You see, she has the freedom to come and go as she pleases. She can take whatever date she wants to, but the minors don't have that same option. She gets to go out to get her nails done. She gets to collect the money and spend money for things. There was a lot of evidence in the record that Lewis was certainly more culpable. Of course, he had a much greater sentence in response to this. But, I mean, this is an aiding and abetting liability case. She aided and abetted Lewis's commission of this act. Was Lewis her pimp before? Was Lewis Moore's pimp before when she was prostituting herself? Before they involved the minors? He moved to Houston after she did. So they met up once she was working in the strip club and prostituting herself in Houston. They knew each other from Flint, but it was— She wasn't working for him. No, she wasn't. And he joined her later after she was already in the business in Houston. There was no emotional relationship between Moore and Lewis. It was just a business. I don't agree with that. There was some sort of emotional relationship, which the court recognized at sentencing, that he mitigated her sentence because he felt like she was under some control of him. So the court took that into consideration when it— Emotional but not romantic. There was a suggestion that she was actually involved with another female prostitute. There was some evidence in the record of that. So if the court doesn't have any further questions or would like me to address any issues, I cede my time. All right. Thank you. Thank you. All right. Back to you, Ms. Smucker. Just very briefly, the question about whether— What is—if she didn't testify herself that she was under threats of violence, et cetera, what's the anchor to your argument that she did these things but under threat? Well, the other girls were being abused in her presence. But if she doesn't say that herself on the stand, she's the primary person who would know that, wouldn't she? I would presume so, and perhaps defense counsel could have done a better job of bringing that out. But I think there's still evidence in the record that she would have been feared. But if she doesn't claim a defense herself, on direct or otherwise, your anchor is for us to get there indirectly based on other evidence. Is that what you're saying? My point is that there was violence involved in this. Once Lewis became involved in the situation, there was violence brought in with him that seemed to control all of the girls to some degree. Okay. And as far as the control of Lewis, let me go back to that and point to some places in the record. Lewis was in charge of what Moore did and how the money was spent. That's at 417 and 418, 425 and 1063. It's multiple times in the record. That Moore did not keep the money even if she was handed it or if it was put in her account. She was not in charge of it. That's at 460, 998, and 1028. That she had to ask Lewis for money to get food, shop, to do anything. That was at 1027. That Lewis would always be the one to tell them that they had to create the ads, which were paid for with the money that CM and KM made through Moore's bank account, but also, again, at Lewis's instruction. That's at 460 and 1091. That Lewis also directed use of the money to buy the girls' clothes and what they were going to buy. And literally, like, Lewis's involvement was maybe she's in the dressing room because she's a woman, and maybe she's going up to the counter and handing the money over. But, again, it's all at Lewis's direction. And that is at multiple places. 460, 1021, 1025, 1047, 1049. The food issue is at 460 and 1022. The drugs is at 1006. Is this her testimony that you're citing or from the victims? This is testimony from the victims, most of it. And I just put the numbers in here. I didn't bid on who was who, but she was sort of her testimony came at the end, and so the earlier numbers are certainly the testimony from the girls during the government's case-in-chief. The business about the charger, the car that was bought, Lewis controlled that. He even kept the keys. That's a couple of places, 430 and that she drove CM and KM to outcalls. Again, at his instruction, 999 and 1018. But Lewis didn't go along when she was delivering? I don't know that it was specified ever in the record one way or the other that he was in the car with her. He gave her the keys at that point. Right. Well, instead, take them here and do that. So, yeah. And, you know, there's also testimony in that regard that she, you know, drove them when she was ordered or asked her aloud to do so. 418, 430, 460, 61, 490, 496. Repeated places in the record that that occurs. So that's that. The other thing is the question about was Lewis involved earlier on. You know, Moore was already prostituting herself before Lewis came down from Flint. They'd known each other in school, in high school in Flint. And it was only after Lewis became involved that this sort of morphed into enticing minors. When she was on her own, it was just her and another girl who was in her 20s who were doing it. So it's his involvement, which is the instigating factor of getting the minors involved. It's not her. And Selina is the one who goes after CM, and then CM is the one who, at Lewis's instruction, goes after KM. I think my time is up. Thank you, Your Honor. Appreciate it. Thank you, Ms. Smoker. You are court appointed in this case. Yes, I am. And the panel and the court as a whole appreciates your work as court appointed counsel, not only in this case but in all other cases, and counsel who step up to take these cases. So we thank you for your briefing and your oral argument. For you, Ms. Berenger, thank you. The case will be submitted.